UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

– against –

CADEEM CLARKE,

                Defendant.

**OPINION & ORDER**

24 Cr. 171 (ER)

---

RAMOS, D.J.:

      On January 9, 2022, Cadeem Clarke was sitting in the passenger seat of a parked car at an intersection in the Bronx with another man, Tevin Tully,[1] who was sitting in the driver's seat, Doc. 1 ¶¶ 5(a), 5(d), when they were approached by six police officers. *See generally* Doc. 41–1, Ex. A;[2] Doc. 41–2, Ex. B;[3] Doc. 41–3, Ex. C;[4] Doc. 44–4, Ex. D.[5] Clarke was smoking a marijuana cigarette at the time. *See* Doc. 41–1, Ex. A at 00:47–01:21. The two men were briefly questioned and asked to exit the car. *See, e.g.*, Doc. 41–3, Ex. C at 03:00–03:35. Both men were handcuffed and transported in custody to the 47th Precinct. *See* Doc. 41–3, Ex. C at 03:30 *et seq.*; Doc. 41–2, Ex. B at 04:30 *et seq.* While the men were detained, a search of the car yielded two firearms and a quantity of marijuana. Doc. 40 at 1. As a result of the search, Clarke was charged with possession of marijuana with intent to distribute and possession of firearms in furtherance of drug

---

[1] Tully is referenced by name in Doc. 41–9, Ex. I.

[2] Doc. 41–1, Ex. A is footage from the body camera worn by the officer referred to as "PO-1" in Clarke's memorandum, Doc. 40.

[3] Doc. 41–2, Ex. B is footage from the body camera worn by the officer referred to as "PO-2" in Clarke's memorandum, Doc. 40.

[4] Doc. 41–3, Ex. C is footage from the body camera worn by the officer referred to as "PO-3" in Clarke's memorandum, Doc. 40. PO-3 has been identified as Officer Argenis Paulino. Doc. 44 at 2 n.2.

[5] Doc. 44–4, Ex. D is footage, submitted by the Government, from the body camera worn by the officer referred to as "PO-4" in Clarke's memorandum, Doc. 40. PO-4 has been identified as Officer Jonathan Lluberes. Doc. 44 at 2 n.2.

distribution. *See* Doc. 12. Pending before the Court is Clarke's motion to suppress evidence of the items obtained from the search; in the alternative, he requests that the Court hold an evidentiary hearing concerning the circumstances of his arrest and the search of the car. *Id.* For the reasons set forth below, Clarke's motion to suppress and his motion for an evidentiary hearing are DENIED.

I.    BACKGROUND

A. The Car Stop and Detention of Clarke

At approximately 6:20 p.m. on January 9, 2022, three uniformed New York Police Department ("NYPD") officers approached a car parked in the cross walk of the intersection of White Plains Road and East 227th Street in the Bronx. *See, e.g.*, Doc. 41–1, Ex. A at 00:27. Clarke was seated in the passenger seat and Tully was seated in the driver's seat. *Id.* at 00:37. The car belonged to Tully's girlfriend. *See, e.g.*, Doc. 41–3, Ex. C at 02:08–02:12. A second trio of police officers also arrived at the scene. Doc. 44–4, Ex. D at 01:00.

At 6:23:04, a police officer ("PO-1") approached and shone a flashlight into the driver's side of the car. Doc. 41–1, Ex. A. At the same time, PO-2 approached the passenger's side of the car. Doc. 41–2, Ex. B at 00:55. PO-1's partner, PO-3 ("Officer Paulino"), followed shortly behind PO-1 to the driver's side. Doc. 41–3, Ex. C at 00:58. PO-1 asked Tully for his license, indicating he would "run" it. Doc. 41–1, Ex. A at 01:07–01:21. The officers could see that Clarke was smoking a marijuana cigarette in the car. *Id.* Officer Paulino asked Tully whether he was smoking, to which Clarke replied, "Nah, just me." *See* Doc. 41–3, Ex. C at 01:35–01:40.

Clarke can be heard on PO-2's camera explaining that the two men were about to move the car but had stopped while trying to find parking. Doc. 41–2, Ex. B at 01:22–01:24. PO-2 told Clarke that he should not be smoking marijuana in the car, and Clarke responded that he understood. *Id.* at 01:55–02:04. The officer then asked Clarke where he and Tully were going, and Clarke told her that they were looking for a particular food

truck and were trying to find its location. *Id.* at 02:07–02:47. She next asked Clarke where he lived; Clarke responded that he lived in Yonkers. *Id.* at 02:47–02:55. The officer followed up by asking for his identification. *Id.* at 02:56–02:58. He told her that he did not have any with him but gave her his full name. *Id.* at 02:58–03:04. She repeated his name back to him, saying, "Cadeem Clarke?" as PO-4 ("Officer Lluberes") approached. *Id.* at 03:03–03:04. As Officer Lluberes approached the car, he said, "What's up, Cadeem?" and then asked him about smoking marijuana in the car; Clarke admitted again that the cigarette contained weed. Doc. 44–4, Ex. D at 01:08–01:27. Clarke's memorandum argues that these questions were "immaterial" to the traffic stop. Doc. 40 at 18.

As other officers spoke to Clarke, Officer Paulino said to Tully, "look where you're parked . . . your tints are extremely dark, and then you nor the passenger . . . have your seatbelt on." Doc. 41–3, Ex. C at 03:00–03:10. Officer Paulino told Tully to exit the car. *Id.* at 03:25. He exited the vehicle and was frisked and handcuffed soon after. *Id.* at 03:30 *et seq.* Tully asked if he was being arrested and PO-1 responded that he would just have to go with the officers "real quick." Doc. 41–1, Ex. A at 03:35–03:39. The officer told Tully that he should not have been smoking in the car, and he replied that he had not been smoking. *Id.* at 03:49–03:55.

PO-2 then ordered Clarke to exit the car as well. Doc. 41–2, Ex. B at 04:11–04:18. The officers promptly handcuffed him, patted him down, and told him he would be written a summons for smoking marijuana in a car. *Id.* at 04:30–04:40. The officers transported Clarke and Tully to the 47th Precinct in separate vehicles. *See* Doc. 44–4, Ex. D at 04:50 *et seq.*; Doc. 41–3, Ex. C at 06:10 *et seq.* During the car ride, PO-1 told Tully, "[i]t's not like you're arrested or anything, just detained . . . for the moment," and discussed the process for writing a ticket at the precinct. Doc. 41–1, Ex. A at 05:50–06:24. The officers transporting Clarke to the precinct did not speak to him. *See* Doc. 44–4, Ex. D at 04:50–07:44.

3

At the precinct, PO-2 and Officer Lluberes searched and took an inventory of Clarke's possessions, which did not include contraband, but did include approximately $1,100 in cash. *See* Doc. 41–2, Ex. B at 10:35–14:30. The officers transported him to a holding cell and removed his jewelry, sweatshirt, and shoes; he was frisked again before being placed in the holding cell. *Id.* at 14:30–20:00. As he was placed in the holding cell, he was told that officers would be back shortly with a summons. *Id.* at 20:02 *et seq*. Clarke's memorandum further establishes that "the officers never did write any summons or ticket" of which he is aware, "nor did they, despite the fact that the driver and the owner of the car lived close to the location of the stop and to the police precinct, attempt to ascertain whether the owner could take possession of the car." Doc. 40 at 19 (citation omitted).

### B. The Car Search

After placing Clarke and Tully in holding cells, five of the six officers from the stop searched the car in the precinct parking lot. The car search was captured on body-worn cameras. *See* Doc. 41–4, Ex. D;[6] Doc. 41–5, Ex. E;[7] Doc. 41–6, Ex. F.[8] The search commenced at approximately 6:49 p.m. *See, e.g.*, Doc. 41–4, Ex. E at 00:59. Quickly after the search began, Officer Paulino shouted "lunch!" to the other officers while searching the front passenger seat area of the car. Doc. 41–4, Ex. D at 01:14–01:22. He placed his camera on the floor of the car to show a handgun under the passenger seat. *Id.* at 01:25–01:33. Officer Paulino then searched the back of the car, opening a bag that was on the seat. *Id.* at 01:55–02:24. Although the camera footage does not provide a clear image of what is in the bag, the officers' comments indicate that they saw marijuana. *Id.* As Officer Lluberes searched the driver's side of the car, he discovered an ammunition magazine and a second firearm in the area behind the steering wheel. Doc. 41–6, Ex. F at

---

[6] Doc. 41–4, Ex. D is footage from Officer Paulino's body camera.

[7] Doc. 41–5, Ex. E is footage from PO-2's body camera.

[8] Doc. 41–6, Ex. F is footage from Officer Lluberes' body camera.

05:10–06:44. After searching the car, the officers put various items back inside[9] and PO-2 collected cell phones from the vehicle. Doc. 41–5, Ex. E at 14:05 *et seq*.

The NYPD Evidence Collection Team prepared a report indicating that "two (2) firearms were recovered inside a vehicle during a pickup car stop," as well as ammunition. Doc. 41–7, Ex. G at 3. The report states that no fingerprints were found on the firearms during dusting, although DNA swabs were sent to the police lab for further analysis. *Id.*

### C. Clarke's Interview

At approximately 10:23 p.m., a detective interviewed Clarke. *See* Doc. 41–8, Ex. H. at 03:20.[10] The detective introduced himself, asked Clarke for his name, birth date, and address, and then asked if he knew why he was at the precinct. *Id.* at 03:29–04:10. Clarke replied that he thought it was because he was in the car smoking [marijuana]. *Id.* at 04:11–04:14. The detective replied that Clarke had a "stupid" I-Card[11] in the system from a complaint filed in a domestic dispute in 2020. *Id.* at 04:18–04:35. Clarke indicated that he did not have knowledge of the I-Card. *Id.* The detective then read Clarke his *Miranda* rights. *Id.* at 04:55–05:50.

The detective next asked Clarke about the car and the circumstances of the stop. *Id.* at 05:55–06:49. The detective mentioned that someone was "taking care" of the I-Card. *Id.* at 06:50–07:07. He also asked Clarke if there was anything in the car that wasn't supposed to be there. *Id.* at 07:09–07:12. Clarke replied that he did not know what was in the car because the car was not his, but admitted that he was smoking

---

[9] Clarke's memorandum also argues that the officers acted improperly in carrying out the search. *See, e.g.*, Doc. 40 at 22 ("[T]he police failed to catalogue items of obvious value—such as a child's car seat—and those of likely value—such as the wrapped gifts."); *Id.* ("[A]n officer left a cup containing ice she had knocked over on the floor of vehicle").

[10] Doc. 41–8, Exhibit H is video footage of the interview between the detective and Clarke.

[11] "An I-[C]ard is an internal NYPD form issued by an officer when there is a suspect, witness, or perpetrator to be investigated." *Johnson v. City of New York*, No. 15 Civ. 1625 (SMG), 2017 WL 1476139, at *2 (E.D.N.Y. Apr. 24, 2017) (citation omitted).

marijuana in the car. *Id.* at 07:13–07:22. Later in the conversation, the detective again asked whether there were things in the car that were not supposed to be there, to which Clarke shook his head and said "no." *Id.* at 08:19–08:23. The detective then explained to Clarke that two guns were found in the car. *Id.* at 08:50–08:57. The detective continued to ask Clarke questions about what he was doing, whether Tully was chauffeuring him around so he could sell marijuana, and whether his fingerprints would be found on the guns. *Id.* at 09:13–11:10. The detective also told Clarke that he knew about his whereabouts and patterns in the neighborhood, including that Clarke frequented the street corner where the evening's incidents occurred.[12] *Id.* at 11:11–12:30. Clarke continued to deny having touched the guns, disclaiming any knowledge about them. *Id.* at 12:39–13:25. At the end of the interview, the detective told Clarke that he would be charged "with these firearms" and sent to Central Booking. *Id.* at 20:09–20:13.

### D. Procedural Background

On January 10, 2022, the day after his arrest, Clarke was arraigned in Bronx Criminal Court on three felony charges and two misdemeanor charges related to possession of firearms and ammunition. Doc. 41–10, Ex. J. All of the charges against him were dismissed on February 18, 2022. *Id.* Later that month, Clarke filed a notice of personal injury claim with the Office of the New York City Comptroller in connection with the stop and its accompanying events. *See* Doc. 41–11, Ex. K. In that claim, Clarke maintained that the traffic stop and detention lacked any basis. *See* Doc. 40 at 10. The City "opted not to defend the conduct" and settled for approximately $50,000. *See id.*

Approximately two years later, on February 21, 2024, United States Magistrate Judge Sarah L. Cave of the Southern District of New York authorized the issuance of an arrest warrant based on a complaint charging Clarke in federal court for the possession of

---

[12] The 2020 Domestic Incident Report against Clarke based on a complaint by an ex-girlfriend, which the detective references during the interview, specified that Clarke is known to frequent the exact corner in the Bronx where this arrest occurred. *See* Doc. 44–5, Ex. E at 1; Doc. 44–6, Ex. F at 1 (noting that Clarke "hangs out @ E 227 & White Plains Rd").

that same contraband. *See generally* Doc. 1. The next day, Clarke was arrested by members of the Drug Enforcement Task Force. Doc. 4. The following day, he was arraigned and ordered detained. *Id.* On March 21, 2024, a grand jury voted to indict Clarke with one count of distributing and possessing with intent to distribute less than 50 kilograms of marijuana in violation of 21 U.S.C. §§ 812, 841(a)(1), and 841(b)(1)(D), and one count of carrying and using firearms during and in relation to and possessing firearms in furtherance of the former drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(i). *See* Doc. 12. On April 16, 2024, the parties appeared before the Court for an initial conference. Doc. 18. On April 16, 2025, Clarke filed a motion to suppress evidence from the search. Docs. 39–41. The Court held oral argument on the motion on June 3, 2025.

## II.    LEGAL STANDARDS

### A. Searches and Seizures Under the Fourth Amendment

The Fourth Amendment to the United States Constitution protects the "right of people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." *Davis v. United States*, 564 U.S. 229, 236 (2011) (citing U.S. Const. amend. IV). "[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) (citing, inter alia, *United States v. Watson*, 423 U.S. 411, 417–424 (1976)). "Probable cause exists if a law enforcement official, on the basis of the totality of the circumstances, has sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing that an offense has been or is being committed by the person to be arrested." *United States v. Steppello*, 664 F.3d 359, 363–64 (2d Cir. 2011) (quoting *United States v. Gagnon*, 373 F.3d 230, 236 (2d Cir. 2004)).

Police officers possess "probable cause to arrest an individual for even a minor traffic violation that is committed in the officer's presence." *See United States v. Fayton*,

697 F. Supp. 3d 179, 191 (S.D.N.Y. 2023) (citing *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001); N.Y. Crim. Proc. Law § 140.10); *see also District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018) (internal citation and quotation marks omitted) ("Probable cause is not a high bar."). However, absent probable cause for an arrest, evidence subsequently obtained because of that arrest can be excluded. *See United States v. Thompson*, 35 F.3d 100, 105 (2d Cir. 1994) (quoting *Wong Sun v. United States*, 371 U.S. 471, 484–87 (1963)).

Under the Fourth Amendment, "a police officer effectively seizes 'everyone in the vehicle,' the driver and all passengers" "for the duration of a traffic stop." *Arizona v. Johnson*, 555 U.S. 323, 327 (2009) (quoting *Brendlin v. California*, 551 U.S. 249, 255 (2007)). The Supreme Court has held that, "in a traffic-stop setting . . . a lawful investigatory stop . . . is met whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation." *Id.* "The police need not have, in addition, cause to believe any occupant of the vehicle is involved in criminal activity." *Id.* "A lawful roadside stop begins when a vehicle is pulled over for investigation of a traffic violation." *Id.* at 333. "The temporary seizure of driver and passengers ordinarily continues, and remains reasonable, for the duration of the stop." *Id.* "An officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Id.* (citing *Muehler v. Mena*, 544 U.S. 93, 100–01 (2005)). However, the Supreme Court has held that "[a]uthority for [a] seizure ends when tasks tied to the traffic infraction are—or reasonably should have been— completed." *Rodriguez v. United States*, 575 U.S. 348, 349 (2015).

### B. Motion to Suppress

"On a motion to suppress evidence in a criminal trial, once [the defendant] has established a basis for his motion, the burden rests on the Government to prove, by a preponderance of the evidence, the legality of the actions of its officers." *United States v.*

*Echevarria*, 692 F. Supp. 2d 322, 332 (S.D.N.Y. 2010) (alteration in original) (quoting *United States v. Wyche*, 307 F. Supp. 2d 453, 457 (E.D.N.Y. 2004)); *see also United States v. Pena*, 961 F.2d 333, 338–39 (2d Cir. 1992) (citation omitted).  If a court concludes that a search or seizure violated the Fourth Amendment, "it must determine whether to suppress the evidence obtained as a result of that illegal search or seizure."  *See United States v. Matos*, No. 17 Cr. 182 (KBF), 2017 WL 5989203, at *3 (S.D.N.Y. Dec. 4, 2017) (citing *Mapp v. Ohio*, 367 U.S. 643 (1961)).  Accordingly, if the government fails to show that a stop was legal, then "its fruits, including the [defendant's] statements and the physical evidence seized . . . must be suppressed."  *United States v. Fiseku*, No. 15 Cr. 384 (PAE), 2015 WL 7871038, at *6 (S.D.N.Y. Dec. 3, 2015), *aff'd*, 906 F.3d 65 (2d Cir. 2018), and *aff'd*, 915 F.3d 863 (2d Cir. 2018) (citing *Wong Sun*, 371 U.S. at 484–86).

### C. Evidentiary Hearing

The Second Circuit has determined that "[a] court must ordinarily hold [a]n evidentiary hearing on a motion to suppress . . . if the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question."  *United States v. Durand*, 767 F. App'x 83, 87 (2d Cir. 2019) (internal citations and quotation marks omitted).  This must be shown "by an affidavit of someone with personal knowledge of the underlying facts" which establish that "disputed issues of material fact exist."  *United States v. Viscioso*, 711 F. Supp. 740, 745 (S.D.N.Y. 1989) (internal citations and quotation marks omitted).  However, an evidentiary hearing will not be required "if the defendant's statements are general, conclusory or based on conjecture."  *Id.* (citing *United States v. Castellano*, 610 F. Supp. 1359, 1439 (S.D.N.Y. 1985)).  Nor will a court grant an evidentiary hearing on a motion to suppress "unless [the defendant] can show a contested issue of material fact with respect to the issue for which the hearing was requested."  *United States v. Parrilla*, No. 13 Cr. 360 (AJN), 2014 WL 1621487, at *4 (S.D.N.Y. Apr.

22, 2014) (quoting *United States v. Del Rosario*, No. 12 Cr. 81 (KBF), 2012 WL 1710923, at *2 (S.D.N.Y. May 11, 2012)). Courts in this district "have broad discretion when deciding whether or not to hold a suppression hearing." *United States v. Shamsideen*, No. 03 Cr. 1313 (SCR), 2004 WL 1179305, at *9 (S.D.N.Y. Mar. 31, 2004).

## III. DISCUSSION

Clarke argues first that the police officers violated the Fourth Amendment by unconstitutionally prolonging what should have been a straightforward car stop, and second that, as a result, evidence from the subsequent car search must be suppressed. *See* Doc. 12. In the alternative, Clarke requests an evidentiary hearing. *Id.* The Court considers each argument in turn.

### A. Stop, Seizure, and Search

New York Vehicle and Traffic Law § 1202(a)(1)(d) establishes that "[e]xcept when necessary to avoid conflict with other traffic, or when in compliance with law or the directions of a police officer or official traffic-control device, no personal shall . . . [s]top, stand or park a vehicle . . . [o]n a cross walk." A violation of §1202(a)(1)(d) is an arrestable offense. *See* N.Y. Veh. & Traf. Law § 155; N.Y. Crim. Proc. Law § 140.10(1)(a). The body-worn camera footage from PO–1, PO–2, and PO–3 clearly indicate, and Clarke does not dispute, that the car was parked on a cross walk, giving the officers probable cause to stop the car. *See, e.g.*, Doc. 41–1, Ex. A at 00:27 *et seq*. Under the standard emphasized in *Johnson*, 555 U.S. at 333, it was lawful for the officers to investigate the traffic violation.

Furthermore, New York Vehicle and Traffic Law § 1227(1) provides that the "consumption of cannabis . . . in a motor vehicle located upon the public highways . . . is prohibited. Any operator or passenger violating this section shall be guilty of a traffic infraction." This is also an arrestable offense. N.Y. Crim. Proc. Law § 140.10(1)(a). Under *Fayton*, 697 F. Supp. 3d at 191, the officers here had probable cause to arrest Clarke separate from the fact that the car was parked in a cross walk; almost immediately

10

after approaching the car, they noticed that Clarke was smoking a marijuana cigarette in the passenger seat. *See, e.g.*, Doc. 41–1, Ex. A at 01:07–01:21. Though Clarke argues that minor traffic infractions "are typically (and most reasonably) resolved by a summons," Doc. 40 at 15, this is not a bright-line rule. On the contrary, the court's holding in *Fayton* that an officer may arrest an individual for even a minor traffic violation renders the officers' actions lawful. *See* 697 F. Supp. 3d at 191.

   Clarke argues that, applying *Rodriguez*, the Court should determine that the traffic stop was prolonged beyond its "mission" of addressing the traffic violation that warranted the stop. *See* 575 U.S. at 354–55 (citing *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). Clarke's theory is that, after following the routine measures of collecting Tully's license, the car's registration, and insurance paperwork, the officers impermissibly extended the traffic stop by detaining Clarke and Tully and searching the vehicle. *See* Doc. 40 at 18–19. However, unlike this case, the police officers in *Rodriguez* had already issued the defendant a warning ticket for his traffic violation, did not arrest him for that violation, and yet proceeded to prolong the traffic stop after the ticket had been issued by conducting a search that led to the discovery of drugs and his eventual arrest. *See* 575 U.S. at 352.

   Instead, *Fayton*, 697 F. Supp. 3d 179, is instructive here. The defendant in that case, like Clarke, was charged with firearm and ammunition possession after the contraband was recovered following a traffic stop. *Id.* at 181. The court declined to apply *Rodriguez* because the defendant had been arrested *before* the inventory search. *See id.* at 188 (citing *United States v. Diaz*, 854 F.3d 197, 209 n.16 (2d Cir. 2017)). The court found that he had "indisputably" been arrested because "[h]e was not free to leave and was placed in handcuffs, which 'are generally recognized as a hallmark of a formal arrest.'" *Id.* (citing *United States v. Newton*, 369 F.3d 659, 676 (2d Cir. 2004)). Notably, the court declined "to consider the time spent conducting the arrest for a traffic violation, obtaining authorization for the arrest, bringing the arrestee to the precinct, and processing the

11

arrestee at the precinct as part of an allegedly elongated traffic stop under *Rodriguez*." *Id.* at 189. For the foregoing reasons, the court declined to suppress evidence garnered from the search. *Id.* at 193. Here, Clarke was directed out of the car and placed in handcuffs within the first few minutes of the stop, Doc. 41–2, Ex. B at 04:10–04:40. These events constituted his formal arrest, for which there was undeniable probable cause. Accordingly, the search was lawful.

Though Clarke argues that multiple indications from the officers on the evening of the arrest indicated that he had not been arrested, but instead would only receive a summons,[13] Doc. 40 at 18–19, such evidence is not dispositive. Indeed, in *United States v. Bignon*, No. 18 Cr. 783 (JMF), 2019 WL 643177, at *2 (S.D.N.Y. Feb. 15, 2019), *aff'd*, 813 F. App'x 34 (2d Cir. 2020), the court determined that the fact that police officers repeatedly represented to the defendant that they intended to issue him a ticket and release him rather than arrest him did not alter the case's outcome. Because Clarke's arrest was "supported by probable cause . . . the search was proper . . . and thus consistent with the Fourth Amendment." *Id.* at *6. The same is true here.

Furthermore, though the officers have attempted to justify Clarke's detention and the resulting search by the discovery of an I-Card against Clarke and their knowledge that he frequented the street corner where the stop occurred to sell narcotics, Doc. 44 at 10–11, such prior knowledge is immaterial to the Court's determination here. Plainly, because the officers witnessed the commission of multiple traffic violations, they had probable cause to make an arrest, which they did at the moment they handcuffed him,

---

[13] Clarke generally frames many of the officers' actions as improper. For example, he asserts that the officers asked questions that were immaterial to the traffic stop, Doc. 40 at 18, that they failed to write a summons or ticket, that they failed to ascertain whether the car's owner could take possession of it, Doc. 40 at 19, and that they acted carelessly while searching the vehicle by not cataloguing certain items and spilling beverages within the car, Doc. 40 at 22. The defense memorandum further references the fact that Clarke filed a claim with the New York City Comptroller regarding the traffic stop and detention which the City "opted not to defend" that resulted in a settlement of approximately $50,000. Doc. 40 at 10. In any case, the Court finds that any such alleged impropriety and carelessness on behalf of the officers is not relevant here.

rendering the remainder of the evening's proceedings outside the scope of the traffic stop under *Rodriguez*.

Lastly, because Clarke "did not have an objectively reasonable expectation of privacy" within a car as a mere passenger, he lacks standing to contest a search of the car beyond arguing that the initial stop that led to the search was unlawful. *See United States v. Santillan*, 902 F.3d 49, 63 (2d Cir. 2018).

### B. Motion to Suppress

Because the government established that the officers' actions in stopping and searching the car were lawful under the Fourth Amendment, the Court finds that the evidence obtained from the search should not be suppressed.

### C. Evidentiary Hearing

Clarke asserts that "an evidentiary hearing is warranted to answer disputed questions of fact, including when Mr. Clarke was arrested and for what, and what the arresting officers relied on in reaching these determinations." Doc. 47 at 1. However, the Court finds that there is no fact in dispute that would negate the existence of probable cause to arrest Clarke for consuming marijuana within the vehicle nor for investigating the initial traffic violation. Clarke has failed to meet his burden that there are disputed issues of material fact as to probable cause. Accordingly, his motion for an evidentiary hearing is denied.

## IV. CONCLUSION

For the foregoing reasons, Defendant's motion to suppress evidence from the car search and motion for an evidentiary hearing are denied. The Clerk of Court is respectfully directed to terminate the motion, Doc. 39.

It is SO ORDERED.

Dated: June 20, 2025
       New York, New York

_____
EDGARDO RAMOS, U.S.D.J.